■ In the Matter of BERNCOLORS-POUGHKEEPSIE, INC., Petitioner, v CITY OF POUGHKEEPSIE et al., Respondents. — Proceeding pursuant to CPLR article 78, as limited by petitioner's brief, to review so much of a determination of respondent City of Poughkeepsie, dated April 14, 1982, as, after a hearing, upheld the order of respondent building inspector that a certain building owned by petitioner should be demolished on the ground that it is unsafe. Determination confirmed insofar as reviewed and proceeding dismissed on the merits, without costs or disbursements. Petitioner Berncolors-Poughkeepsie, Inc., is a dye-manufacturing company with its headquarters bordering the Hudson River and Fallkill Creek in the City of Poughkeepsie. There were three buildings on the site. On January 14, 1982, an explosion occurred, followed by a fire, in the main manufacturing facility of petitioner's plant (referred to as building B). Two employees of the plant, who were working in the first floor front portion of building B were killed in the course of the explosion. The explosion and fire resulted in the spillage of chemical materials at and around the site and the exposure of additional chemicals to the elements. The United States Coast Guard intervened to supervise the cleanup. Inspections of the scene were conducted by the City of Poughkeepsie Building Inspector and by various fire department personnel. The building inspector issued notices to petitioner on or about February 10, 1982 declaring two of the structures on petitioner's premises to be unsafe buildings within the provisions of section 6-35 of the Code of Ordinances of the City of Poughkeepsie. The notices concerned a one-story, brick-walled structure, which housed the boilers and which was part of building B, the building most heavily damaged by the explosion, and a one-story brick and concrete block structure which was used primarily for storage (hereinafter building C). The building inspector's report set forth the following findings with respect to the damage caused to these buildings: "BUILDING B This building was the most heavily damaged by the explosion, and was the apparent scene of that event. The initial inspection of the site revealed that the four story section of this building nearest North Water Street had virtually ceased to exist. Fragments of the north wall of the section were scattered to the north for a distance of approximately forty yards. A portion of a drier later established to have been located along the north wall was observed in the yard of the Central-Hudson site on the other side of the Fallkill Creek from the Berncolors facility. The other exterior walls of the front section of this building were also dislocated by the force of the explosion, but apparently not as great an extent as the north wall. With the collapse of the walls, the roof and floors were unsupported and apparently collapsed downward. The extent of this damage appears in photographs 16, 17, 18, 19, 20, and 21, while the piece of the drier referred to above appears in photograph 67. The force of the explosion also damaged the five story stair tower along the north wall of the building. It removed some of the brick from the parapet and opened a large crack in the south wall of the tower. The crack extended downward from the roof to and through openings for doors in the wall, and into the pile of rubble at the base of the tower. This damage appears in photographs 3, 4, 5, 6, 7, 8, 22, and 23. The wall which separated the front portion of this building from the center portion was also severly [sic] displaced by the blast. A large portion of the north wall of the building to the rear (east) of the stair tower was also blown out by the force of the blast. This damage can be observed in photographs 27, 28, 29, 30, 31, 34 and 35. The center portion of the building was also severly [sic] damaged. The south wall was sheared off at an angle approximating 45° from east to west, and the four floors and the roof partially collapsed to the ground. This condition is illustrated in photographs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14. The damage to the rear, one story, portion of this building from the initial blast was apparently confined to damage to the

roof from debris. During the course of the clean-up operation it was necessary for the Coast Guard to cause the demolition of significant portions of this building. All that currently remains is the one story portion at the rear. A detailed inspection of this portion of the building has revealed that it is *Unsafe* as: 1. A substantial portion of the east wall was removed during the demolition of the remainder of the building; 2. A portion of the roof has been removed; 3. The exterior walls are deteriorated and have shifted, particularly the south wall; 4. There is evidence of foundation movement, in the form of severe cracking, particularly in the south and west walls; 5. The roof members are deteriorated; and, 6. There is some damage as an apparent result of the explosion of January 14, 1982. The conditions noted with respect to this portion of the building appear in photographs 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46. BUILDING C This building was severly [*sic*] racked, apparently as a result of the explosion of January 14, 1982. This caused extensive damage to the exterior masonry walls, and this damage has been further compounded by the fact that the building was covered with ice as a result of fire-fighting efforts in connection with Building B, which was located only some ten feet to the south. This ice covering has lead to further deterioration of the building. The racking is evident in the damage to such parts of the building as the doors and door frame and in damage to the concrete block walls, as well as in the fact that the south wall is separated from the east wall at the south-east corner of the building. A detailed inspection of this building revealed that it is *Unsafe* due to: 1. The racking detailed above; 2. The resultant destabilization of the exterior walls; 3. The above cited damage to the walls of the building; 4. The separation of the walls from each other; 5. Damage to the roof members, apparently as a result of the explosion of January 14, 1982; and, 6. Weather and freeze-thaw damage to the structure in the days following the explosion." The notices issued pursuant to section 6-35 of the Code of Ordinances of the City of Poughkeepsie directed petitioner to demolish building C and the boiler room section of building B within 30 days of issuance of the notices on the ground that said structures were in imminent danger of collapse. Petitioner was informed that it could be liable for criminal prosecution and civil penalties for each day of noncompliance, but that an administrative hearing for the purpose of reviewing this determination could be requested. On February 18, 1982, petitioner submitted requests for a hearing with respect to both buildings, alleging that the structures involved housed "equipment and machinery, the dismantling and removal of which would exceed the cost of repair of the building". In a letter dated March 5, 1982, Thomas P. Halley, Assistant Corporation Counsel for the City of Poughkeepsie, from the office which represents respondents in this proceeding, advised petitioner that he had been appointed hearing officer in this matter and asked petitioner if it objected to his serving that capacity. Petitioner failed to raise any objections prior to the commencement of the hearing. A hearing was conducted on March 16, 1982 in the course of which testimony was taken from building inspector Michael D. Haydock and from John V. Kane, III, a licensed architect who testified on petitioner's behalf. The hearing officer rendered a decision upholding the determination of the building inspector that the subject structures should be demolished. In the course of this decision, it was noted that respondents' authority to order that a building be demolished rather than repaired emanates from the constitutional delegation to municipalities of the power to enact laws for the "government, protection, order, conduct, safety, health and well-being of persons or property therein" (NY Const, art IX, § 2, subd [c], par [10]). The exercise of the police power at issue herein was, moreover, found to be consonant with statutory and common-law provisions, for the following reasons: "The Legislature has empowered every city to 'adopt a local law or

ordinance compelling the repair or removal of any building or structure that, from any cause, endangers the health, safety or welfare of the public'. (General City Law, Section 20, Subdivision 35). The delegation of the police power to a municipality is very broad. It includes 'everything essential to the public safety, health, and morals'. (*Lawton v Steele,* 152 US 133, affirming 119 NY 226; 6 McQuillan [*sic*] Municipal Corporations, Section 24.71). It has long been recognized that a local government, in the proper exercise of its delegated powers, may summarily abate a public nuisance, and it may compel the owner of the property involved to bear the cost of such abatement (*Gregory v City of New York,* 40 NY 273 [*sic*]; *City of Buffalo v Danker,* 48 AD2d 572, Appeal dismissed, 38 NY2d 826, 16 Opinion of the State Comptroller, 1960, Page 72). In addition, the State Legislature has consistently recognized the need for a municipal body to be empowered to abate unsafe building conditions by demolition, and has vested such authority in the municipality's building inspector. (cf. Multiple Residence Law, Section 205, General Municipal Law, Section 78-b)." Petitioner thereupon commenced this article 78 proceeding to review the order of demolition. Petitioner's two main contentions are that the building inspector's order exceeded the authority vested in him pursuant to subdivision c of section 6-35 of the Code of Ordinances of the City of Poughkeepsie, insofar as petitioner was not afforded the option of correcting the unsafe conditions rather than demolishing the subject buildings, and that the determination made as a result of the hearing was not supported by substantial evidence. Although the proceeding originally concerned the notices of demolition with respect to two separate buildings, petitioner subsequently abandoned its objections vis-à-vis the remaining portion of building B and demolished that structure. The present proceeding, therefore, concerns only building C, the so-called "accessory" structure. It is our conclusion that the record contains substantial evidence that building C suffered severe damage from racking due to the explosion in nearby building B, which resulted in the destabilization of significant portions of the load-bearing southerly wall and the other walls connecting therewith. The Building Inspector of the City of Poughkeepsie presented ample evidence of the structural defects in the subject building to sustain his determination that it constituted an unsafe building which should be demolished. During the course of the hearing, respondents stipulated that the unsafe conditions could be remedied by either demolition or repair, depending upon the amount of money which petitioner was willing to expend. The building inspector did consider the alternative of repair but, upon an evaluation of building C in its total context, determined that it "constituted an actual and immediate danger and that this danger should be addressed by removal of the building". Inasmuch as there were no official guidelines or criteria to determine whether or not a building should be demolished, the matter was properly left to the judgment of the building inspector, based upon the facts as he perceived them as an individual experienced in architectural and engineering matters. We note further that petitioner's expert failed to proffer any cost estimates for the repairs which he suggested in lieu of demolition. Nor did he render any opinion regarding the efficacy of repairs for correcting these serious structural defects. Furthermore, petitioner predicated its challenge to the demolition order not upon the value of the building itself but, rather, upon the presence of equipment and machinery located therein which would be costly to remove. Respondents note, however, that petitioner planned to remove similarly valuable equipment from building B prior to its demolition. In view of these considerations, the demolition order constituted a valid exercise of police power and the determination of the hearing officer is supported by substantial evidence on the record. With respect to allegations of bias on the part of the hearing officer, it is well settled that the combination of

investigative and adjudicative functions in a single administrative agency or officer is not, *ipso facto,* a denial of due process (see *Withrow v Larkin,* 421 US 35; *American Cyanamid Co. [Lederle Labs. Div.] v Public Serv. Comm.,* 88 AD2d 1063; *Matter of Seven South Main St. v Seaboyer,* 57 AD2d 1031, mot for lv to app den 42 NY2d 809). Moreover, there is no evidence in the instant case that the hearing officer was personally involved in any of the investigatory or prosecutorial actions in this matter. Further, petitioner raised no objection to the appointment of the hearing officer prior to the hearing. We have considered petitioner's remaining contentions and find them to be without merit. Mollen, P. J., Lazer, Weinstein and Rubin, JJ., concur.